Clerk's Office
Filed Date:  3/24/21

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------x
BRITTANY HAMILTON, RICHETTA
GREENE, DAVONE GREENE,
                                    Plaintiffs,
          -against-

LOUIS SCARCELLA, FRANK DELOUISA,
JOSEPH PONZI, WILLIAM "BILLY" WHITE,
THE CITY OF NEW YORK, NEW YORK
CITY POLICE DEPARTMENT,
                                    Defendants.
----------------------------------------------------------x

U.S. DISTRICT COURT
EASTERN DISTRICT
OF NEW YORK
BROOKLYN OFFICE

NOT FOR PUBLICATION
**MEMORANDUM & ORDER**
17-CV-6384-CBA-SJB

**AMON, United States District Judge:**

On November 2, 2017, Brittany Hamilton, Richetta Greene, and Davone Greene (together, "Plaintiffs") initiated this action against Louis Scarcella, Frank DeLouisa, Joseph Ponzi, William "Billy" White, the City of New York, and the New York City Police Department (together, "Defendants").[1]  The personal defendants are sued in their individual and official capacities.  On January 30, 2020, Plaintiffs filed their First Amended Complaint, (ECF Docket Entry ("D.E.") # 44 (the "Complaint" or "Compl.")), the operative complaint now before the Court.  Their claims arise from the wrongful conviction of Derrick Hamilton, see generally, People v. Hamilton, 115 A.D.3d 12 (N.Y. App. Div. 2014), Richetta's ex-husband and Brittany and Davone's father.[2]  Plaintiffs allege that Defendants violated their rights under New York State law and rights to familial association under the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution.

---

[1] Defendant William White has since been dismissed from the case.  (D.E. # 47.)  Defendants DeLouisa, Ponzi, the City of New York, and the New York City Police Department are collectively referred to as the "City Defendants."  Defendant Scarcella is a retired New York Police Detective and is represented by independent counsel.

[2] In a separate action before me, Hamilton sued the same defendants, asserting various claims arising from his wrongful conviction.  See Hamilton v. City of N.Y., No. 15-cv-4574 (CBA) (SJB), 2019 WL 1452013 (E.D.N.Y. Mar. 19, 2019).

Presently before the Court are separate motions from Defendant Scarcella and the City Defendants, both moving pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure to dismiss all six claims in Plaintiffs' Complaint.  For the reasons herein provided, Scarcella's motion to dismiss is granted in whole, and the City Defendants' motion to dismiss is granted in whole.

## ALLEGATIONS OF THE FIRST AMENDED COMPLAINT[3]

In January 1991, Nathanial Cash was shot to death in Brooklyn, NY.  (Compl. ¶ 29.) Derrick Hamilton, Plaintiffs' ex-husband and father, was indicted for that murder, convicted, and subsequently exonerated in 2015.  (Id. ¶ 10.)  This action arises out of his wrongful conviction.

It is alleged that New York City Police Detectives Scarcella and DeLouisa, as well as Investigator Ponzi, investigated Cash's murder and engaged in several unsavory investigatory techniques in furtherance of obtaining Hamilton's conviction.  First, Defendants "coerced" the sole witness to the Cash shooting, Jewel Smith, to produce a "fabricated" statement identifying Hamilton as the shooter.  (Id. ¶¶ 12, 44.)  Despite Smith's original statement that she did not see the shooter, DeLouisa and Scarcella threatened to separate her from her children if she did not cooperate.  (Id. ¶ 13.)  Smith has since recanted her testimony.  (Id. ¶ 39.)  Defendants also did not attempt to obtain a statement from other persons who may have witnessed the shooting. Additionally, Scarcella directed another officer to "intimidate" two witnesses to ensure that they did not appear in court.  Hamilton intended to call these two witnesses to support his alibi— specifically, that he was in New Haven, CT on the night of the Brooklyn shooting.  (Id. ¶¶ 18, 19.) Finally, Scarcella is alleged to have conspired with another officer to fabricate evidence

---

[3] The following facts and allegations are taken from the Complaint.  I assume the truth of the facts and well-pleaded allegations for the purposes of this motion.  See ATSI Comm'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007).

discrediting a defense witness and to have offered false testimony during a procedure held pursuant to New York Criminal Procedure Law Section 440 in 1996.  (Id. ¶ 46.)[4]

Plaintiffs also allege that Defendants spoke with Richetta Greene about Hamilton on two separate occasions during their investigation.  In March 1991, Scarcella and an unidentified officer "showed up at Richetta Greene's mom['s] house with the intention of alienating Derrick's entire family from him by spreading lies that he was a murderer."  (Id. ¶ 35.)  Specifically, Scarcella said to Richetta, "in sum and substance":

> Do you know where Derrick is? Are you aware that Derrick killed someone? Are you aware your husband is a murderer? We're looking for Derrick because he was involved in an incident where Nathaniel Cash got killed in an altercation involving Nate's girlfriend. Derrick shot him and killed him. You should know what type of guy you are dealing with, he is a murderer, he is dangerous, he killed this guy. This is not Derrick's first brush with the law.

(Id. ¶ 15.).

At the time of this interaction, Richetta was pregnant with her daughter, Brittany. (Id.) Davone, however, was then eight years old and was present.  He "saw Detective Scarcella yell at his mother, insult his father, and point his finger in their faces," and he was thereafter "visibly upset and shaken."  (Id. ¶ 16.)  On a separate occasion in or around March 1991, Detective Frank DeLouisa and Investigator Joseph Ponzi visited the Hamilton home and communicated statements to Richetta "further indicating that Derrick Hamilton was a murderer, a threat, and could not be trusted."  (Id. ¶ 15.)  It is alleged that both DeLouisa and Ponzi conveyed this information to Richetta with the intent to intimidate her, deprive her of the right to her spousal relations, and intentionally alienate Davone to secure testimony.  (Id.)

---

[4] Plaintiffs further allege that Scarcella has a pattern of corrupt practices and that over five murder convictions have been overturned and over seventy convictions are being reviewed by the Kings County District Attorney's Office. (Compl. ¶ 51.)

As a result of Hamilton's incarceration, and "due to the efforts of the defendants to secure the wrongful conviction, Mr. Hamilton became estranged from his children and his wife." (<u>Id.</u> ¶ 22.)  Hamilton's children "resented him" and "blamed him" for being imprisoned.  (<u>Id.</u> ¶¶ 23, 24.)  For her part, Richetta "suffered a loss of consortium in that she has been deprived of the familial relationship including the care, sexual relations, companionship, household help, financial support, emotional support, and love of her husband." (<u>Id.</u> ¶ 27.)  In short, Plaintiffs allege that "as a result of the defendants' wanton and malicious conduct, the plaintiffs suffered severe familial discord and the loss of services of a father and husband." (<u>Id.</u> ¶ 55.)

## STANDARD OF REVIEW

To survive a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, a complaint must "provide the grounds upon which [the] claim rests." <u>ATSI Commc'ns</u>, 493 F.3d at 98; <u>see also</u> Fed. R. Civ. P. 8(a)(2) ("A pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief . . . .").  To meet this standard, plaintiffs must allege "enough facts to state a claim to relief that is plausible on its face." <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009).  In reviewing a Rule 12(b)(6) motion to dismiss, a court must accept as true all factual allegations in the complaint and draw all reasonable inferences in favor of the plaintiff.  <u>ATSI Commc'ns</u>, 493 F.3d at 98.  However, that tenet "is inapplicable to legal conclusions." <u>Iqbal</u>, 556 U.S. at 678.  Thus, a pleading that offers only "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." <u>Twombly</u>, 550 U.S. at

4

555.  If the plaintiff "ha[s] not nudged [its] claims across the line from conceivable to plausible, [its] complaint must be dismissed."  Id. at 570.

## DISCUSSION

Plaintiffs' Complaint presses six causes of action.  In claims one, two, and three—brought by Richetta, Brittany, and Davone, respectively—each Plaintiff sues under 42 U.S.C. § 1983 for a violation of their constitutionally-protected right to familial association and companionship (the "Familial Association Claims").  (Compl.  ¶¶ 58–75.)  Claim four alleges intentional infliction of emotional distress.  (Id.  ¶¶ 76–78.)  Claim five alleges negligent infliction of emotional distress.  Claims four and five are brought by all Plaintiffs against all Defendants.  (Id.  ¶¶ 79–82.)  Claim six, brought by all Plaintiffs against only the City of New York, alleges misconduct  in the hiring, training, and supervision of certain employees of the New York City Police Department.  (Id.  ¶¶ 83–84.)

### I.   The Familial Association Claims (Counts 1–3)

It is well established that there is a federal constitutional right to intimate association, see Roberts v. U.S. Jaycees, 468 U.S. 609, 617–18 (1984), and that this right "in at least some circumstances protects familial relationships from unwarranted government interference."  Patel v. Searles, 305 F.3d 130, 135 (2d Cir. 2002).  In 2018, the Second Circuit addressed this right to intimate familial association, as found in the Fourteenth Amendment.  Gorman v. Rensselaer Cty., 910 F.3d 40, 47 (2d Cir. 2018).  The Gorman court held, for the first time in this Circuit, that "a claim under the Due Process Clause for infringement of the right to familial associations requires the allegation that state action was specifically intended to interfere with the family relationship."  Id. at 48 (emphases added).  Moreover, "[a] claim for infringement of the right to familial association requires conduct so shocking, arbitrary, and egregious that the Due Process

Clause would not countenance it even were it accompanied by full procedural protection." Id. at 47 (internal quotation marks omitted).

Plaintiffs' Familial Association Claims fail because (a) Plaintiffs fail to plausibly allege in a non-conclusory fashion that Defendants intended to interfere with the family relationship; and (b) Defendants' alleged conduct was not so shocking as to violate the Due Process Clause.[5]

A. **Plaintiffs Fail to Adequately Allege that Defendants Intended to Interfere with the Family Relationship**

Although Plaintiffs repeatedly cite Patel v. Searles for the proposition that the Second Circuit "has never held that a challenged action must be directed at a protected relationship for it to infringe on the right to intimate association," 305 F.3d at 137, as noted above, the Second Circuit did answer that question in a subsequent opinion and held that a challenged action must be have been undertaken with the intent to interfere in the family relationship. Gorman, 910 F.3d at 48. Plaintiffs argue that, in any event, their Complaint sufficiently alleges this intent on the part of Defendants, relying almost entirely on the claimed similarity of its allegations to the allegations in Patel v. Searles that survived dismissal on appeal. Patel is distinguishable.

Patel sued police investigators for infringing on his constitutional right to familial association.[6] Patel, 305 F.3d at 133. Patel's mother and sister were murdered, and, after months of fruitless investigations, the frustrated defendant-officers "allegedly focused the criminal inquiry on plaintiff by concocting and disseminating false evidence about him [; the] intention [being] to create hostility and mistrust among the members of his family towards him with the hope that the resulting animosity would produce accusations against him." Id. at 134. The defendants focused

---

[5] For these reasons, I need not reach Defendants' arguments regarding qualified immunity or the statute of limitations.

[6] This right is called both the right to familial association and the right to intimate association. See Patel, 305 F.3d at 139 (using both labels). I use the two terms interchangeably.

these efforts directly against Patel's family members.   They "drafted fake confession letters blaming plaintiff's cousin" for the murder and "mailed the fake letters to two daily newspapers and to plaintiff's father, falsely claiming they came from plaintiff's typewriter."   Id.   One year later, the police continued this scheme by drafting a memorandum stating why Patel was a suspect, which memorandum allegedly contained multiple falsehoods that undermined Patel's character and insinuated guilt.   Id.   Patel's complaint alleged that the "defamatory memorandum . . . was 'prepared specifically with the understanding and intention that it would be published and distributed to various members of [Patel's] family . . . .'"   Patel v. Searles, No. 3:99-cv-1230-SRU, 2000 WL 1731338, at *2 (D. Conn. Nov. 14, 2000), aff'd, 305 F.3d 130 (2d Cir. 2002). Moreover, a year after the scheme began, a defendant officer travelled from Connecticut to Tennessee—where Patel had moved as a result of the defendant's conduct—and gave Patel's wife Seema a letter that accused Patel of murder.   Patel, 305 F.3d at 134.   The officer then "further related that Patel was leading a double life," which Seema would unlikely know of, and that "Seema and her children's lives were in danger, as Patel 'could reach that point of anger again.'" Id.   In sum, Patel set forth factual allegations of concerted, protracted conduct taken directly against his family.   See id. at 140 (describing defendants' conduct as "extended public and private defamatory misinformation campaign to destroy a family").   Because of the defendants' actions, Patel was ostracized from his family, and his father and siblings refused to talk to him.   Id. at 134.

Presented with those allegations—and applying the then-applicable lower pleading standard set forth in Conley v. Gibson, 355 U.S. 41, 45–46 (1957)—the Patel court concluded that plaintiff "adequately allege[d] a violation of his right to intimate association.  Id. at 135, 138.  The court declined to decide whether the plaintiff was required to plead that the defendants intended to infringe on his associational rights but concluded nonetheless that he "ha[d] alleged facts sufficient

to prove that the officers' conduct <u>was</u> intentionally directed at his family.  <u>Id.</u> at 137 (emphasis in original).

To analyze Plaintiffs' allegations in light of <u>Patel</u> and assess the adequacy of their pleadings, I divide Plaintiffs' allegations into two categories: (1) coercing witnesses and fabricating evidence (hereinafter, the "investigatory misconduct"); and (2) the two occasions in March 1991 where Defendants told Richetta that her husband was a murderer and a threat (hereinafter, the "March 1991 statements").  I address each in turn.

     i.     <u>The Investigatory Misconduct</u>

Plaintiffs argue that Defendants intimidated alibi witnesses and coerced Jewel Smith's testimony "in an attempt to create mistrust and strain on the family relationship."  (D.E. # 59 ¶ 9, D.E. # 62 ¶ 9.)  Notably, that assertion is not in the Complaint.  Indeed, the Complaint does not once specifically allege that the any of the investigatory misconduct was undertaken with the intention of interfering with Plaintiffs' family relationship.  Rather, the Complaint generally alleges that "Defendants' systemic misconduct . . . was in violation of their well-established constitutional rights to familial association and access to courts."  (<u>Compl.</u> ¶ 54.)  Additionally, the Complaint alleges in each of counts one through three that "Defendants' conduct was intentional and egregious in nature," without referencing any conduct in particular.  (<u>Id.</u> ¶¶ 61, 67, 72.)  These bald recitals of the elements of the claim are insufficient to survive dismissal.  <u>Iqbal</u>, 556 U.S. at 678–9; <u>Twombly</u>, 550 U.S. at 555.

Plaintiffs attempt to remedy this deficiency by arguing unpersuasively that their allegations of investigatory misconduct mirror those in <u>Patel</u>.  In <u>Patel</u>, the plaintiff alleged that defendants had <u>directly</u> targeted <u>multiple family members</u> (<u>e.g.</u>, his father, siblings, cousin, and wife), with the intention to do so as a means of obtaining his conviction.  By contrast, Plaintiffs here allege

investigatory misconduct directed at <u>non-family member</u> witnesses. The theory here that Defendants targeted non-family members as a means of imprisoning Hamilton, which was in turn a means of realizing an intention to infringe on his and his family's associational rights is implausible. <u>See</u> <u>Lara-Grimaldi v. Cty. of Putnam</u>, No. 17-cv-622 (KMK), 2019 WL 3499543, at *4 (S.D.N.Y. Aug. 1, 2019) (holding that plaintiff did not plausibly allege a specific intent to interfere with the family relationship where complaint lacked allegations that defendants "said or did anything that would suggest they sought to disrupt Plaintiff's relationship"). Instead, the alleged associational harm stemming from the investigatory misconduct was "at best the indirect and incidental result of [such] conduct." <u>Gorman</u>, 910 F.3d at 48; <u>see also</u> <u>Kogut v. Cnty. of Nassau</u>, No. 06-CV-6695 (JS) (WDW), 2009 WL 2413648, at *14 (E.D.N.Y. Aug. 3, 2009) (dismissing familial association claims brought by a wrongfully convicted man's family where alleged investigatory misconduct was not directed at plaintiffs).

ii.    <u>Defendants' March 1991 Statements to Richetta Regarding Hamilton</u>

Plaintiffs argue that the March 1991 statements were intentional attempts to undermine the family's cohesion in furtherance of obtaining Hamilton's conviction, and that allegations of similar conduct survived dismissal in <u>Patel v. Searles</u>, 305 F.3d 130.  Although Plaintiffs' associational claims are more colorable when based on statements directed at a family member than the investigatory misconduct directed at non-family, I conclude that <u>Patel</u> is distinguishable and that Plaintiffs have failed to sufficiently allege that the March 1991 statements were made with the specific intent to interfere in the family's relationship.

Plaintiffs contend that "Defendant[s] use[d] nearly identical methods as used in <u>Patel</u>, in order to 'create hostility and mistrust among the family members that would ultimately lead to false accusations.'"  (D.E. # 59 ¶ 10 (quoting <u>Patel</u>, 305 F.3d at 137); D.E. # 62 ¶ 10.)  Certainly,

the Defendants' March 1991 statements to Richetta are at least somewhat like Patel's allegation that the police told his wife he was a murder.  However, in contrast to the present allegations, the conduct against Patel's wife was more egregious, not made in furtherance of the police's search for a suspect, and part of a much broader "direct[] assault[] [on] Patel's intimate family relations through lies and chicanery" that directly targeted multiple members of his family.  Patel, 305 F.3d at 137.  Accordingly, any inference that the conduct against Patel's wife was undertaken with the intent to interfere with Patel's associational rights was substantially bolstered by factual allegations showing that defendants targeted Patel's other family members.  Such allegations are absent from the present Complaint.

Instead, the allegations here support the Defendants' contention that they had a legitimate law enforcement reason to make the March 1991 statements, and that any impairment on the family relationship was incidental to that interest.  Plaintiffs here allege that Scarcella went to Richetta's mother's home in an apparent attempt to locate Hamilton.  (See Compl. ¶ 15) (Scarcella asking "[d]o you know where [Hamilton] is . . . were [sic] looking for [Hamilton]).)  See Albert v. City of N.Y., No. 17-CV-3957-ARR-SMG, 2019 WL 3804654, at *3 (E.D.N.Y. Aug. 13, 2019) ("Where the defendants were motivated by other legitimate interests—rather than an intent to deprive the plaintiff of her rights to associate with her family members—such a claim cannot survive.").  He then told Richetta that Hamilton was a murderer and was "dangerous."  (Compl. ¶ 15.)  With regard to DeLouisa and Ponzi, Plaintiffs allege only that they "approached Richetta [] with statements further indicating that [] Hamilton was a murderer, a threat, and could not be trusted."  (Id.)  And, with regard to Plaintiffs Brittany and Davone, there are no express allegations in the Complaint that the Defendants were even aware that the children were members of the family allegedly interfered with.  Indeed, Brittany was not yet born in March 1991.

Absent further factual allegations like those in Patel, Plaintiffs' allegations appear more like those in Gorman, where the district court rejected the intimate association claim, concluding that plaintiff "failed to allege any facts that would allow a reasonable jury to infer that" the defendant intentionally interfered with a sibling relationship. 910 F.3d at 43. The Second Circuit affirmed that judgment, notwithstanding the fact that the plaintiff alleged action directed in fact against two members of the family, as well as harm flowing from it. Id. at 44. It concluded that "any impairment of the sibling relationship was at best the indirect and incidental result of [defendant's] conduct. Accordingly, Gorman has failed to identify any evidence that would allow a reasonable jury to infer that [defendant] infringed on Gorman's right to intimate associations under the Due Process Clause." Id. at 48.

In sum, the factual allegations here are qualitatively and quantitively distinguishable from Patel and are insufficient to support Plaintiffs' allegations of intent. See Iqbal, 556 U.S. at 679 (to avoid dismissal, "well-pleaded facts [must] permit the court to infer more than the mere possibility of misconduct"); see also Albert, 2019 WL 3804654, at *2, *4 (holding that plaintiffs failed to plausibly plead that officers had the specific intent to interfere with their familial association rights where officers responding to the scene of a shooting physically prevented plaintiffs from aiding and comforting their relative-victim); McCray v. City of N.Y., No. 03-cv-9685 (DAB), 2007 WL 4352748, at *3, *27–28 (S.D.N.Y. Dec. 11, 2007) (dismissing plaintiffs' intimate associational claims following relative's wrongful conviction because plaintiffs failed to show intent to disrupt family, notwithstanding allegations that "[d]efendants also manipulated [p]laintiffs and their family members, turning the family members into interrogators") (internal quotation marks omitted)).

**B.  The Relevant Conduct Complained of Did Not Violate the Due Process Clause**

Even crediting Plaintiffs' conclusory allegation that the March 1991 statements to Richetta were made with the requisite intent to infringe on their right to familial association, I conclude that these statements do not violate the Due Process Clause.[7]

"A claim for infringement of the right to familial association requires conduct so shocking, arbitrary, and egregious that the Due Process Clause would not countenance it even were it accompanied by full procedural protection." Gorman, 910 F.3d at 47 (internal quotation marks omitted).  Moreover, the Supreme Court has instructed that the "behavior. . .that would most probably support a substantive due process claim [is] conduct intended to injure in some way unjustifiable by any government interest [; this] is the sort of official action most likely to rise to the conscience-shocking level."  Cnty. of Sacramento v. Lewis, 523 U.S. 833, 849 (1998) (emphasis added).

In Patel, the defendants relied on Griffin v. Strong, 983 F.2d 1544 (10th Cir. 1993) in arguing that "Patel's right to intimate association [was] outweighed by legitimate governmental interests, namely, the investigatory necessities of a double homicide." Patel, 305 F.3d at 137–38. The Patel court neither adopted nor rejected the Tenth Circuit's balancing approach, but it did proceed to fully analyze Patel's claim under the framework provided in Griffin.  See id. at 138. Doing the same, I conclude that the allegations in the instant case concerning the March 1991 statements much more closely resemble the one lie told during a consensual interview in Griffin than the concerted campaign of lies directed against multiple family members in Patel.  (See Compl. ¶ 15.)  "Insofar as it is appropriate to weigh the strength of [P]laintiff's associational rights

---

[7] Because, for the reasons stated in text, the other conduct alleged outside the March 1991 statements does not support even a colorable contention that Defendants intended to infringe on Plaintiffs' familial association rights, I do not consider those allegations in this Section.

against the [D]efendants' behavior in the instant case," <u>Patel</u>, 305 F.3d at 138, I conclude that "on the balance, the infringement of familial rights of association in this case" attributable to the March 1991 statements "is slight." <u>Griffin</u>, 983 F.2d at 1549; <u>see also</u> <u>Albert</u>, 2019 WL 3804654, at *5 (holding defendants' actions—even if they were conducted with the specific intent required by <u>Gorman</u>—were not sufficiently egregious to support a substantive due process claim).

## II.   Plaintiffs' State Law Claims Under New York Law (Counts Four, Five, and Six)

### A. <u>Intentional Infliction of Emotional Distress (Count Four)</u>

Plaintiffs' state-law claim under New York law for intentional infliction of emotional distress is barred by the statute of limitations and, accordingly, it is dismissed as against all Defendants.

"Federal courts apply state statutes of limitations to intentional tort claims." <u>Young v. Suffolk Cnty.</u>, 705 F. Supp. 2d 183, 211 (E.D.N.Y. 2010) (internal quotation marks omitted). Under New York law, this claim is subject to a one-year statute of limitations. <u>See id</u>. (citing <u>N.Y. C.P.L.R. § 215(3)</u>). Plaintiffs do not dispute this. (D.E. # 62 ¶ 28.) [8] Although the parties differ as to the date by which this claim accrued, I need not resolve that dispute, as Plaintiffs' claim fails, even assuming that their claim accrued at the latest possible date of January 9, 2015, when Hamilton's conviction was vacated.

Assuming, as Plaintiffs suggest, that the statute of limitations began to run on January 9, 2015, their original complaint—filed on November 2, 2017, (D.E. # 1)—was well outside the one-year window. Moreover, the original complaint did not assert a claim for intentional infliction of

---

[8] Plaintiffs and Scarcella both submit that the applicable statute of limitations as to Count Four is one year. (D.E. # 57 at 14; D.E. # 59 ¶ 22; D.E. # 62 ¶ 26 (each citing <u>N.Y. C.P.L.R. § 215(3)</u>).) City Defendants argue that the applicable statute of limitations is one year and ninety days. (D.E. # 61 at 16 (citing <u>N.Y. Gen. Mun. Law § 50-i(1)(c)</u>).) The difference is immaterial here. Under either statue-of-limitations period, Plaintiffs' claim in the Amended Complaint for intentional infliction of emotional distress is untimely as to all Defendants, even assuming <u>arguendo</u> that the claim relates back to the original complaint, which was also untimely under either limitation period propounded.

emotional distress.  This claim was raised for the first time in the Amended Complaint, filed January 30, 2020, (D.E. # 44), also well outside the one-year window.  Accordingly, there is no need to inquire as to whether the claim "relates back", see Fed. R. Civ. P. 15(c), to the original complaint, as even the original complaint was untimely.  Plaintiffs do not dispute as much.  (D.E. # 62 ¶ 28.)

Instead, Plaintiffs urge that I simply decline to apply the statute of limitations because "it is within the interest of justice that the Court find this statute of limitations tolled until the date of the original Complaint."  (Id.)  Plaintiffs cite no relevant authority in support of that argument. Their assertion that the "general policy of the courts [is] to permit actions to be determined by a trial on the merits whenever possible" is supported by a string citation to several wholly-inapposite New York State court decisions regarding vacatur of default judgments.  Moreover, to the extent that Plaintiffs are seeking equitable tolling, that argument also fails.  They have made no showing that they are entitled to such relief, which is granted only in "rare and exceptional circumstances" where "extraordinary circumstances prevented a party from timely performing a required act, and [] the party acted with reasonable diligence throughout the period he sought to toll."  Walker v. Jastremski, 430 F.3d 560, 564 (2d Cir. 2005) (internal quotation marks and alterations omitted).

## B.  Negligent Infliction of Emotional Distress (Count Five)

Plaintiffs also bring a state law claims for negligent infliction of emotional distress ("NIED") against all Defendants.  The claims are dismissed as to all Defendants.

### i.    Statute of Limitations

The parties dispute the proper statute of limitations applicable to this claim.  Plaintiffs assert that, as against all Defendants, the statute of limitations is three years.  (D.E. # 62 ¶ 29 (citing Dawkins v. Williams, 413 F.Supp.2d 161, 177 (N.D.N.Y. 2006) (citing N.Y. C.P.L.R. § 214)).)

14

Citing the same authority, Defendant Scarcella asserts the same three-year limitation.[9]   City Defendants, however, contend that the statute of limitations is here governed by N.Y. Gen. Mun. Law § 50-i, and that the statute of limitations for all claims against the City of New York is one year and ninety days.  They further argue that this statute of limitations is applicable to employees of the City of New York.

With respect to the defendant City of New York I conclude that § 50-i provides the applicable statute of limitations.  That law provides that "[n]o action or special proceeding shall be prosecuted or maintained against a city . . .unless. . . the action or special proceeding shall be commenced within one year and ninety days after the happening of the event upon which the claim is based."  N.Y. Gen. Mun. Law ("GML") § 50-i(1).  Moreover, § 50-i provides that this section "shall be applicable notwithstanding any inconsistent provisions of law, general, special or local . . . ."  Id. § 50-(i)(2); see also Rentas v. Ruffin, 816 F.3d 214, 226 (2d Cir. 2016) ("In New York, an IIED claim must be brought within one year of the injury. N.Y. C.P.L.R. 215(3).  But when, as in this case, a plaintiff sues the City (or an individual whom the City must indemnify), a one–year–and–90–day statute of limitations applies.") (citing GML § 50–i; Ruggiero v. Phillips, 739 N.Y.S.2d 797, 799–800 (N.Y. App. Div. 2002)).  Assuming, as Plaintiffs suggest, that their negligence claim accrued as late as January 9, 2015, they were required to bring their claim against the city by April 8, 2016.  Their original complaint—filed on November 2, 2017, (D.E. # 1)—was well outside that window.  Moreover, the original complaint did not assert a claim for negligent infliction of emotional distress.  This claim was raised for the first time in the Amended Complaint, filed January 30, 2020, (D.E. # 44), also well outside the window.  Accordingly, Plaintiffs' claim

---

[9] However, Scarcella also indirectly raises the City Defendants' statute-of-limitations arguments because he incorporates the City Defendants' briefing into his own. (D.E. # 57-3 at 18.)  Moreover, he switches his position in his reply brief to argue that the negligence claim against him is subject to a one-year-and-ninety-days limitation.  (D.E. # 58 at 12.)

for negligent infliction of emotional distress as against the city of New York is dismissed as untimely.

With regard to the individual defendants, I need not resolve the parties' dispute as to which statute of limitations applies (the one-year-and-ninety-day or three-year limitation) for two reasons: First, to the extent the NIED claim is grounded in the March 1991 statements, it is time-barred, even under the three-year statute of limitations.  A NIED claim based on the March 1991 statements does not relate back and would be untimely even under Plaintiff's proposed statute of limitations because the March 1991 statements were not raised until the Amended Complaint and are entirely distinct from the conduct alleged in the original complaint.  Lehman XS Trust v. Greenpoint Mortg. Funding, Inc., 916 F.3d 116, 128 (2d Cir. 2019) ("[C]laims that are based on an entirely distinct set of factual allegations will not relate back.") (internal quotation marks omitted).  Second, Plaintiffs' NIED claims fail on the merits.  I now turn to the merits.

ii.    Plaintiffs' NIED Claim Fails Under New York Law

Plaintiffs seek recovery under a "special circumstances" theory of liability, Baker v. Dorfman, 239 F.3d 415, 421 (2d Cir. 2000), which is based on New York's recognition of a cause of action in cases where there is "an especial likelihood of genuine and serious mental distress, arising from . . . special circumstances, which serves as a guarantee that the claim is not spurious." Id. (quoting Johnson v. State, 37 N.Y.2d 378 (1975)).  Fleshing out the elements of this theory, the Court of Appeals observed that:

> It is well-settled that a person to whom a duty of care is owed . . . may recover for harm sustained solely as a result of an initial, negligently-caused psychological trauma, but with ensuing psychic harm with residual physical manifestations. A breach of the duty of care resulting directly in emotional harm is compensable even though no physical injury occurred when the mental injury is a direct, rather than a consequential, result of the breach and when the claim possesses some guarantee of genuineness.

16

Ornstein v. N.Y. City Health & Hosps. Corp., 10 N.Y.3d 1, 6 (2008) (internal quotation marks and citations omitted).

"The latter element may be satisfied where the particular type of negligence is recognized as providing an assurance of genuineness, as in cases involving the mishandling of a corpse or the transmission of false information that a parent or child had died."   Taggart v. Costabile, 14 N.Y.S.3d 388 (N.Y. App. Div. 2015).   Absent such specific circumstances, satisfaction of this element "generally requires that the breach of the duty owed directly to the injured party must have at least endangered the plaintiff's physical safety or caused the plaintiff to fear for his or her own physical safety."  Id.

Plaintiffs allege that "Defendants owed a duty of care to the Plaintiffs to act with reasonable care and breached that duty when they wrongfully arrested and imprisoned Derrick Hamilton and lied to plaintiffs regarding his guil[t]."  (Compl. ¶ 80.)  Insofar as the claim is based on the allegations of investigatory misconduct directed against Hamilton and the non-family witnesses that were raised in the original complaint, Plaintiffs' claim fails.  First, they have not provided any authority that holds or suggests that this conduct provides the requisite "guarantee of genuineness." Ornstein, 10 N.Y.3d at 6.  Second, their alleged harm is the consequential, rather than direct result of that alleged misconduct.  Id.

Plaintiffs primarily rely on the March 1991 statements as the basis for their NIED claim. They argue that wrongfully informing a family member that their husband or father was a murderer is analogous to the particular type of negligence recognized as providing an assurance of genuineness, e.g., the mishandling of a corpse or the conveyance of false information that a parent or child had died.  Their failure to cite any case supporting that contention is notable considering that "New York courts have expressed a 'longstanding reluctance to recognize causes of action for

17

negligent infliction of emotional distress, especially in cases where the plaintiff suffered no independent physical or economic injury.'" Colo. Capital Invs., Inc. v. Owens, 304 F. App'x 906, 908 (2d Cir. 2008) (summary order) (quoting Broadnax v. Gonzalez, 2 N.Y.3d 148, 153 (2004)). Plaintiffs further contend that they have satisfied this element because the March 1991 statements were "intended to immediately cause the Plaintiffs to fear for their own safety." (D.E. # 59 ¶ 14). Plaintiffs have not, however, alleged anywhere in the Complaint or argued in their briefs that this conduct in fact "caused the plaintiff[s] to fear for [their] own physical safety." Taggart, 131 A.D.3d at 253.

### C.  Hiring, Training, and Supervision (Count Six)

Finally, Plaintiffs bring a claim against the City of New York for its "intentional, deliberately indifferent, careless, reckless, and/or negligent failure to adequately hire, train, supervise, and discipline its agents, servants and/or employees employed by the NYPD with regard to their aforementioned duties, and for negligent retention of same." (Compl. ¶ 84.)

For the reasons provided above, this claim is barred by the statute of limitations and must be dismissed as untimely. GML § 50-i(1); Alicea v. City of N.Y., No. 16-cv-7347 (LAP), 2020 WL 1528478, at *5 (S.D.N.Y. Mar. 31, 2020) ("New York's statute of limitations for negligence claims against municipal defendants is one year and ninety days.").

18

## CONCLUSION

For these reasons, I conclude that each of Plaintiffs' claims must be dismissed. The Defendants' motions to dismiss, D.E. # 57 and D.E. # 60, are granted in their entirety. The Clerk of Court is directed to enter judgment accordingly.

SO ORDERED.

Dated: March 24, 2021
      Brooklyn, New York                /s/ Carol Bagley Amon
                                     Carol Bagley Amon
                                     United States District Judge